WOOD v. DAVIS et al.

(Circuit Court, D. Montana. January 17, 1900.)

No. 58.

JUDGMENT—RELIEF AGAINST IN EQUITY—FRAUD.

A court of equity may enjoin a defendant from availing himself of a judgment at law in his favor which was procured by his fraud at suit of one who was not a party to the action in which such judgment was rendered; but to authorize the granting of such relief the fraud must be clearly proven, and it must have been the inducing cause of the judgment. Evidence that false testimony was adduced by the successful party is not alone sufficient, unless it appears to a reasonable certainty that, but for such testimony, the judgment would have been different.

In Equity. Suit for relief against a judgment on the ground of fraud.

Charles M. Demond and C. P. Drennen, for complainant.

W. W. Dixon and Forbis & Forbis, for defendants Andrew J. Davis, Jr., and First Nat. Bank.

William Scallon, for defendant James A. Talbott.

William Scallon and John W. Cotter, for defendant Leyson.

E. N. Harwood, for defendant John E. Davis.

BEATTY, District Judge. The complaint alleges that on March 11, 1890, Andrew J. Davis died at his home in Butte, Mont., leaving a large estate and numerous heirs, including complainant, who was one of his sisters; that about June 24, 1890, a paper purporting to be his will, executed July 20, 1866, bequeathing his property to his brother, John A. Davis, was propounded for probate in the proper court; that contests were filed against the probating of such alleged will by part of said heirs, including complainant, which, after a trial, and failure of the jury to agree, were compromised, the will being admitted as genuine, and agreement made by the heirs for a division of the estate, not including, however, the controversy involved in this case; that defendant Talbott was in August, 1890, appointed special administrator, and in March, 1895, was succeeded by defendant Leyson as administrator with the will annexed; that the deceased had owned 950 shares of stock of the First National Bank of Butte; that the defendant Andrew J. Davis, Jr., a nephew of deceased, claimed to own by gift from him, and had possession of, the said shares; that under an order of the state court said Talbott, as such special administrator, about December, 1893, brought an action against defendant Andrew J. Davis, Jr., to have his claim to the stock declared void; that such proceedings were had that in May, 1894, the court held and adjudged said Andrew J. Davis, Jr., the owner of said stock; that appeal was taken from this decision to the supreme court of Montana, which, in November, 1895, affirmed the decision of the lower court (Leyson v. Davis, 17 Mont. 220, 42 Pac. 775); that in said supreme court defendant Leyson was substituted in the record for Talbott, whom he had succeeded as administrator. The complaint then charges that a most corrupt conspiracy was entered into between all the defendants and the attorneys for Talbott,

and that through the gross frauds committed by these alleged conspirators the said judgment was recovered by said Andrew J. Davis, Jr. The complainant asks that he be enjoined from enjoying any of the benefits of such judgment, and that he account to the estate for all said stock, and the profits that have accrued therefrom. All the allegations of fraud are denied by the defendants.

It is seldom that a pleading is presented so replete with charges of fraud, deceit, and criminal combination, and couched in diction so direct and uncompromising, as is this complaint; and, if true, most assuredly the complainant's prayer should be granted. In view of the testimony, it must be said that at least some of the charges are most recklessly made. It is true, they are made under the usual allegation that they are upon "information and belief," but when an affiant invokes the protection of this shield he should at least be reasonably sure that his information is from such source, and made under such circumstances, that a prudent person can believe it true. It is not sufficient that the allegation is upon "information," for that is not a license to make any statement that may serve a purpose; the information must be believed to be true. The record in this case is so voluminous that no attempt will be made to refer in detail to the many questions raised, and, before taking up any of those of fact, it may be better to determine the limits of some of the legal propositions to be dealt with. The gravamen of the action is that the judgment recovered in the bank-stock case was obtained solely through the fraud of the parties connected therewith, and that, therefore, said Andrew J. Davis, Jr., may now be enjoined from its enjoyment. There can be no doubt concerning the rule in such cases, and it has been so well defined that it is unnecessary to enter into any special discussion of it. When the action is in the nature of an independent suit, and it is alleged that through fraud a judgment has been recovered in some other proceeding, jurisdiction exists to grant such relief that the unjust judgment may be in effect so controlled that its beneficiary will gain nothing by it. But the court cannot entertain jurisdiction when the action is only so incidental or supplemental to some other proceeding as to be a part or continuation of it; nor can it act as a court of review of the proceedings of some other court, or reconsider questions of law or fact passed upon by it, or review any of the alleged errors committed by the other court. The frequently cited case of Marshall v. Holmes, 141 U. S. 589, 12 Sup. Ct. 62, 35 L. Ed. 870, fully states the rule which must govern here, and no other reference to authority need be made.

Complainant's counsel, in his argument, seems to imply that the evidence introduced in the state court in the former case will be considered here with the view of determining its sufficiency to support the judgment there had. Nothing of the kind can be done. Testimony here to show that the testimony there was produced through some fraudulent agreement or combination which resulted in such false testimony as controlled the result may be considered. Upon this, however, the authorities are not in accord. 3 Enc. Pl. & Prac. 630. But that the testimony as given was not sufficient to justify the judgment cannot be considered. The state courts have already

held that it was sufficient, and that conclusion, as well as their construction of the law concerning gifts causa mortis, as before stated, are not now questions for investigation or decision by this court. It is a well-settled rule that the evidence to prove any fraud upon which to found a judgment or decree must be "clear and satisfactory." Lalone v. U. S., 164 U. S. 255–257, 17 Sup. Ct. 74, 41 L. Ed. 425. This rule must be applied with equal, if not greater, vigor in a case in which the object is to annul the judgment of another court because of fraud in its procurement. The fraud must be distinctly and clearly proven; and, not only that, but, if the evidence untainted by fraud was sufficient to justify the judgment, the proof that there was fraud in the case will not affect the judgment.

The chief questions in this case are those of fact concerning the allegations of fraud. What, then, are they, or some of them, and what is the testimony in support of them? It is said of defendant Leyson that he was heavily indebted to the bank of which said Andrew J. Davis, Jr., was cashier and manager; that they were intimate friends; that "by reason of a false, corrupt, and unlawful conspiracy between him and said Andrew J. Davis, Jr., and by reason of the threats of said defendant Andrew J. Davis, Jr., and by reason of a fraudulent agreement between them not to have said judgment reviewed," he refused to take the necessary steps, though requested to do so, to have the judgment reviewed by the supreme court of the United States. It appears that Leyson is one of the most prominent business men of Butte; that nothing whatever appears against his personal character; that he was indebted to the bank in the sum of about $6,000; that there is no evidence of any threats against him by said Andrew J. Davis, Jr.; that he declined to take the case to the supreme court because his counsel advised him that he had no cause; and that they were correct is shown by the dismissal of the case by that court after it was taken there by some of the heirs, who had the right to do so. Leyson v. Davis, 170 U. S. 36, 18 Sup. Ct. 500, 42 L. Ed. 939. It is charged that the bank-stock case was commenced "pursuant to a corrupt, wrongful, and fraudulent conspiracy and agreement" between Talbott and Andrew J. Davis, Jr., both being officers in the bank; that such an agreement embraced, among other things, that Davis should "present to the court full and clear evidences of said alleged gift"; that Talbott should be one of his witnesses, and "should give false evidence with respect to said pretended gift," and that Davis should procure other false and perjured testimony; that all the witnesses called were friends of Davis, and that, "pursuant to said fraudulent conspiracy and agreement, none of said witnesses were asked one word in cross-examination by counsel for said James A. Talbott, and no evidence was offered by him or them to impeach them, or any of them"; that other witnesses, including the United States judge, were permitted to testify without interruption, and were not cross-examined; that witnesses whom Talbott and his attorneys knew could give adverse testimony to said Davis were not called. Also it is repeatedly charged in counsel's brief and argument that Talbott was a man unworthy of belief, a gambler and keeper of

disreputable resorts, a man of low origin; and that no attempt was made to impeach his credibility, or to show his character. The record shows that for about 20 years Talbott had been a confidential business associate with the deceased; that in August, 1890, when an application was pending before the court by some of the heirs for appointment as administrator, Talbott was called as a witness, and, as I understand, was unexpectedly asked about the gift of the stock to Andrew J. Davis, Jr.; that, without being an applicant, he was appointed special administrator, and was able to give a very large bond; that when directed by the court to commence action against said Andrew J. Davis, Jr., for the stock, instead of showing him favor, although associated with him in the bank, and also believing, as he had long before testified, that the stock had been given him, he employed against him the attorneys who had been before employed by those heirs of the deceased whose interest it was to recover the stock and add it to the estate's assets, and the counsel employed had in ability no superiors in the state of Montana. There is no positive evidence to show that Talbott did anything to defeat the action, or acted in bad faith, and the most that can be said is that it might be suspected that he would favor Davis, because of his association with him; but the charges of bad faith and of the various corrupt agreements alleged are not proven. As explained by some of the testimony, there was no attempt to impeach the witnesses referred to because their character was such that they were not impeachable. The objection that had been interposed to the testimony of Judge Knowles was promptly withdrawn when it appeared therefrom that it could be argued that the deceased had not given the stock to Andrew J. Davis, Jr., but only that he had expected to; nor is there any reliable evidence that there was any intentional omission on the part of Talbott's attorneys to call witnesses who could have helped their cause, and at least one—William Wehrspaun—whom it is charged should have been called, and who has testified in this case, would, if called, have done little, if any, good, for he corroborated, rather than contradicted, the testimony of Talbott and Davis, Jr., as to the gift. To impeach Talbott, complainant's counsel has in this action introduced Mrs. Neidenhofen, whose deceased son had been married to Talbott's daughter. She testified to Talbott's bad character for truth and honesty; also to a conversation with him, shortly after her son's death, in which they discussed the criminal conduct of the son, while clerk of the court, in the bank-stock suit. She, it seems, was the keeper of some kind of a store; that she had had trouble with Talbott and Davis, and had made threats concerning their lives, of taking the law into her own hands. Her entire testimony considered, suggests that before receiving it as entirely credible, it must be supported, which is attempted by the testimony of her partner in business, E. Potting, who, it seems, took some little interest in her troubles with Talbott. The other impeaching witness is William Wilson, who had known Talbott over 30 years before, when they were partners in the gambling business, and who testified to Talbott's gambling pursuits up to 1876 or 1877, when he quit,

and went into business with the deceased; also that his reputation for truth and honesty was bad. This witness has also had trouble with Talbott, and for many years was himself a gambler. If gambling impeaches Talbott's character, it is difficult to understand why it would not also that of this witness, and especially as his testimony shows that he has not entirely reformed all his wild ways. If Talbott is of the very bad character charged, it is strange that after a long residence in Butte, where he has been engaged in active business, some entirely reputable and unprejudiced witnesses could not be found to say so. Courts cannot hold that the character of a witness is so impeached that his testimony must be disregarded except upon the testimony of witnesses who are themselves above impeachment, and by such unequivocal testimony from them that it cannot be doubted. Also it is charged that one Darnold, after having given false testimony in the former case for Davis, Jr., was removed and kept away from the state, and that while away he was supported by Davis, was by him furnished with $1,500, besides other amounts, in payment for his false testimony; that prior to giving his testimony he was poor and impoverished, and wholly without means, but that since he has been in prosperous circumstances, and has been from time to time paid large sums of money by Davis, Jr.; that, after returning to Butte, he, on July 6, 1894, sent a letter to Davis, Jr., demanding $10,000 for his services in giving such false testimony, and that thereafter Davis paid him various sums; that, after returning to Butte, having become repentant for what he had done, he first confessed his sin to J. R. Boyce, Jr., then to Curtis, Boyce's brother-in-law, to Stapleton, and finally, on July 12th, six days after writing the letter to Andrew J. Davis, Jr., he went with Boyce to Helena, and confessed to Talbott's attorneys, who took his affidavit to that effect, which having at their disposal they did not use upon the motion for a new trial, nor did they get the affidavit of Judge Stapleton to so use. There is no clear evidence that Davis, Jr., had Darnold leave the state, and, notwithstanding the statements that much money was paid him by Davis, there is no evidence that he paid him any, but, on the contrary, the testimony shows that he was during all the time of these transactions "poor and impoverished"; that on one occasion Boyce says he saw him at a restaurant, after giving his testimony; that he had some money; did not see any large amount; Darnold paid for their dinner; that Darnold told him after returning from Ohio that one Gansberger had furnished him considerable money on the trip,—$700 or $800,— and yet, while on the trip it appears that he drew on one of the Davises for $25, which was paid; that when they went to Helena to make the affidavit Boyce paid all their expenses, and shortly thereafter loaned Darnold $75, on which he left the state; and, so far as remembered, this is all that the record shows of his financial condition or operations. The circumstances under which the letter of July 6th, with which said Boyce is closely connected, was sent to Davis, Jr., demand some consideration. It seems that there was a claim against Boyce of about $60,000 for which the bank sued him, and which he claimed was unjust; that he had some

hopes for a time of getting it compromised through Davis, Jr.; also he thought Darnold was a valuable witness for him concerning this claim; that a letter written by him to Erwin Davis, a brother of deceased, concerning the fraudulent character of the bank-stock suit, probably led to the institution of this action; that, after the complaint was prepared, a copy was furnished him by counsel, and there is some reason to believe that he had some hope that the success of the complainant in this action might lead to the settlement of his claim with the bank; and certainly he is complainant's chief witness in this case, and many things show that he has taken an unusual interest for a witness who is not a party to the litigation. Boyce says the letter of July 6th, referred to, was written by Darnold, who showed it to him; that he advised him that it was not right to send such a letter; that while Darnold was down in town Boyce made a copy of the letter, and then went to his brother-in-law, Curtis, to have him compare and identify the letters; that afterwards Darnold sent a letter to Davis, Jr., to which it seems there was no signature, and he informed Boyce of all he had done, although Boyce had advised him of the wrong of such an act. The very great interest which Boyce took in this matter need only be mentioned, and left without comment. When this letter was sent it would seem that Darnold had not been sufficiently impressed with the heinousness of the sin committed several months before in giving his false testimony, but, after waiting for and getting no response to his letter, he suddenly became convinced of his wrong, confessed it to several, and then Boyce took him to Helena, where the affidavit was made. Complainant's counsel severely criticises the counsel in the former case that they did not use this affidavit on motion for a new trial. The testimony shows that it was made with such conditions attached that it could not be used by counsel without a violation of their promises given Darnold. Instead, however, as the testimony is understood, they procured and used upon the motion for a new trial the affidavits of Boyce and Curtis as to the confession of Darnold that his testimony was false, and they asked Stapleton for his affidavit, but he declined to give it; so that in the record in the state supreme court there is the evidence that Darnold's testimony was false, but that court regarded his testimony as unimportant, and near the close of its opinion (Leyson v. Davis, 17 Mont. 220, 42 Pac. 775), says that, if his testimony were excluded, there "would be abundantly sufficient to sustain the conclusion reached by the district court."

The great majority of the many charges made of conspiracy and fraud are such as could have been carried out only through the direct action and control of Talbott's counsel. The charges made against them, especially in the argument and brief of complainant's counsel, are as unsparing and ruthless in their denunciation as will be found in the record of any court against the boldest conspirators. Notwithstanding the direct and implied charges of professional delinquency and crimes alleged in the complaint against these attorneys, counsel has criticised them for testifying in this case without having been formally subpoenaed. Their testimony is entirely per-

tinent to the issues, and, if it were not, why should they not, by their testimony, repel the assaults made upon their character? A lawyer's good name is about his only heritage for a life of toil and struggle. If he lose that, he is poor indeed. In integrity and honor he should be without rivals. To him the most valued business interests, the highest concern of life, the holiest secrets of men are unreservedly intrusted. He who would betray such sacred trusts would neither be entitled to nor receive the protection of any court. To the honor of the profession, it is true that those trusts are seldom betrayed. The attorneys against whom these most serious charges are made are old citizens of the state. Their reputation for legal ability and high character has gone far beyond the borders of Montana. They have reached that age when life would be too short to re-establish a dethroned character. It is not, therefore, wonderful that they accepted the opportunity to protect that character. It would be if, by their silence, they had invited the conclusion that the charges were true. After a most careful examination of this entire record, it is my undoubted conclusion that there is absolutely nothing therein worthy of belief that sustains the charges made against those counsel, but, on the contrary, so far as can be judged from what is presented of the proceedings of that case, they conducted it with unquestionable zeal and ability. Had they been possessed of all the additional light developed by the experience of this cause, it is doubtful that they could have called any other witnesses who would have materially aided them. Darnold's testimony might have been weakened, possibly entirely overthrown; but they say that Boyce, who made the suggestions of Darnold's false testimony, had so prevaricated in his testimony when placed upon the stand that they had lost faith in his statements.

Before concluding this, which, perhaps, is already too lengthy, let us consider briefly complainant's testimony bearing upon the charges of fraud, especially as to the suppression of testimony. Boyce is complainant's chief witness. He testified that he was present at the bank-stock case trial as a spectator only, but, on hearing Darnold's testimony concerning the gift of the stock to Andrew J. Davis, Jr., that he immediately went to Talbott's attorneys, and told them that the testimony was false; that it could be so shown by some of his account books. Also he says that Darnold had told him before the trial that he intended giving false testimony for the money there was in it, and that he (Boyce) told Talbott's counsel of this. While they admit this, they say, for reasons before stated, that they had lost confidence in all Boyce's statements. Boyce also says that he had the affidavit of Darnold, and that he offered it to those counsel for use, and that they did not use it; but Corbett, an attorney, who was called by complainant, says that, shortly after the affidavit was made, Boyce, Darnold, and McConnell came to his office in Butte with it, but that all said it could not be used, because of the conditions under which it was made, and by their consent Corbett put it in his safe, subject to Boyce's order, where it remained about a year, when Boyce called for and received it. This witness also testifies of conversations he had with Davis, Jr., showing that

the stock had not been given him. Taking all his testimony as substantially true, it would not lead to an undoubted conclusion that the judgment was based upon fraud. When, however, his difficulty with the bank and Davis, Jr., his interest and part taken concerning the Darnold letter of July 6th, his interest in having him make the affidavit, his control of it, his interest taken in the former and in this case, are all considered, his testimony must be doubted. McDougall, a stenographer, was called to show that Davis, Jr., and Talbott had testified in August, 1890, at the application for the appointment of an administrator, that at the interview with deceased in December, 1889,—just before he left on a trip,—he in effect said that Andrew J. Davis, Jr., was to have the bank stock if he did not return. It is claimed that such testimony did not show that a gift had been made, but only showed an intention to give upon the occurrence of a future event, which did not take place; and that this testimony was not introduced is evidence of fraud on the part of Talbott's attorneys. The theory just stated is the one upon which they tried the case, and they did not offer to introduce the testimony of Davis, Jr., lest it would give him the opportunity of explaining and modifying it. As to Talbott, they did, in effect, introduce his statement made in 1890. There is not in all this any evidence of fraud, but only a question of the exercise of good judgment in the management of the trial. Judge Stapleton testified that Boyce, with whom he was acquainted, brought Darnold, with whom he was not acquainted, to his bedroom, at 11 o'clock at night, when he was in bed, to have Darnold make the affidavit, and witness told them to go to Talbott's attorneys in Helena. Curtis says that Toole, one of Talbott's counsel, came to him, and appealed to him—almost forced him—to make an affidavit concerning Darnold's confession of his false testimony. William Wehrspaun testified concerning the time when Talbott and Andrew J. Davis, Jr., were with the deceased in December, 1889, concerning which so much is said in this case, that the deceased, with papers in his hands, coming up to Davis, Jr., said: "'This shall be yours. Take good care of them if I do not come back.' And the judge [deceased] took these papers, and laid them in the box." He also testified that Darnold was not at the house at the time he testified that he had been; also that Andrew J. Davis, Jr., had told him on one occasion that the deceased had left him nothing; and Mrs. Wehrspaun testified to the latter statement, but said that Davis, Jr., said it in a "joshing" way, and she did not take it as a serious statement.

The foregoing states, I think, the strongest features of complainant's testimony. That the testimony which counsel are charged with fraudulently omitting at the former trial could have been introduced to advantage to their cause is not entirely clear; that they knew of it all is not shown; that they fraudulently omitted any of it cannot be concluded from all the testimony in the case. The conclusion is that it has not been shown that the judgment was procured by fraud; that the complainant's bill in this action must be dismissed, and defendants have their costs; which is accordingly ordered.